17625

S. M. GARY, Respondent, v. C. B. JORDAN, Appellant

(113 S. E. (2d) 730)

*Messrs. C. T. Graydon* and *Augustus T. Graydon,* of Columbia, *for Appellant,*

*Messrs. Thomas H. Pope, Robert D. Schumpert* and *R. D. Parler,* of Newberry, and *Frank L. Taylor,* of Columbia, *for Respondent,*

*Messrs. C. T. Graydon* and *Augustus T. Graydon,* of Columbia, *for Appellant,* in Reply.

March 14, 1960.

LEGGE, Justice.

Plaintiff, a resident of Newberry County, owned and maintained there an accredited herd of dairy cattle. In July, 1956, he purchased from the defendant, a cattle trader residing in Richland County, twenty Holstein cows and heifers, which were to have been added to plaintiff's herd. Upon test of their blood taken on August 31, 1956, it was discovered that six of the animals so purchased were positive reactors to brucellosis, more commonly known as Bang's disease. Thereafter, outbreaks of the disease in plaintiff's herd necessitated the slaughter of some thirty cows and quarantine of the remainder. This action for fraud and deceit resulted, based upon alleged misrepresentations made by the defendant to the plaintiff in regard to the twenty animals before mentioned.

Defendant, admitting the sale, alleged that just prior to it the cattle had been tested by the State Veterinary Laboratory and found to be free of Bang's disease; and he alleged by way of counterclaim that the plaintiff owed him seven hundred dollars in connection with his replacement of six of plaintiff's cows that had been slaughtered.

Upon the trial at the February, 1959, term of the Court of Common Pleas for Richland County, the presiding judge

overruled defendant's motions for nonsuit and direction of the verdict, and submitted the case to the jury, which found for the plaintiff six thousand eight hundred ($6,800.00) dollars actual damages. Thereafter, defendant's motions for judgment *n. o. v.* and for new trial having been overruled, this appeal followed.

Having agreed that the verdict was amply sustained, as to amount, by the uncontradicted evidence of damage counsel have very properly omitted such testimony from the transcript of record.

Appellant's numerous exceptions raise six questions:

1. Was there sufficient evidence of fraud and deceit to carry that issue to the jury?

2. Should the plaintiff have been held barred from recovery by reason of his acts subsequent to the alleged fraud?

3. Did the trial judge err in allowing an amendment of the complaint at the conclusion of plaintiff's case?

4. Was there error in the admission of certain testimony?

5. Did the trial judge err in permitting cross-examination of the defendant concerning an injunction proceeding instituted in January, 1957?

6. Did the trial judge err in refusing to charge certain requests submitted by the defendant?

The plaintiff testified that he had started his herd in 1938; that thereafter its growth had resulted from artificial breeding under the Clemson College program; that, except for ten cows that he bought in 1954 from a Mr. Powers, he had made no purchases of cattle prior to his transaction with the defendant here involved; that his herd was tested for Bang's disease once a year by Dr. Sutherland, a veterinarian of Union, S. C.; that except for one reactor in 1951 or 1952, which was slaughtered, there had never been Bang's disease in his herd until after the transaction in question; and that at that time the herd was an accredited one, numbering about eighty.

It is undisputed that early in July, 1956, the plaintiff and his herdsman, Mr. Pelkie, in company with the defendant, visited the latter's pasture for the purpose of buying some cows; that the plaintiff at that time advised the defendant that he had an accredited herd and wanted "clean" cows; that the defendant assured him that his cows were "clean", that he had already had them tested for Bang's, but would have those that the plaintiff might buy tested again and would deliver them after the results of the tests were received; that the defendant and Pelkie selected, by neckchain numbers, thirty-one cows, from which, after having been tested, twenty were to be delivered at plaintiff's farm; and that delivery was made, about a week later, on July 14, and thereupon the plaintiff paid the agreed purchase price, $6,500.00.

The plaintiff testified that thereafter, following a call from a neighboring dairyman, he had Dr. Sutherland on August 31, 1956, draw blood for Bang's disease test of the cows that he had purchased from the defendant; that that test, reported by the State Veterinary Laboratory under date September 4, 1956, showed that six of them were reactors; that on September 7, 1956, Dr. Baker, of the State Veterinary Laboratory, visited his farm and ordered those six cows slaughtered immediately; and that his herd was thereupon quarantined. Further, that in the course of Dr. Baker's visit they telephoned to the defendant, who, when plaintiff reminded him of his guarantee that the cows were free of Bang's, replied that he "couldn't guarantee them forever", but that if the plaintiff would send him the indemnity check that the plaintiff would receive from the State, and also the amount of salvage that he might get from the slaughtered animals, he (defendant) would replace those animals; and that accordingly the indemnity and salvage checks were sent to the defendant, who delivered three replacements to plaintiff's herdsman about a week later and the remaining three to the plaintiff on October 5, 1956. On September 28, 1956, plaintiff's herd, 75 cows, was bled by Dr. Sutherland for Bang's disease test, and the report of this test, dated October

1, 1956, showed no reactors and no suspects. On November 14, 1956, another test revealed four reactors and five suspects. Subsquent tests showed the following results:

| Date | No. of Cows | Reactor | Suspects |
|------|-------------|---------|----------|
| 12/17/56 | 76 | 0 | 7 |
| 1/17/57 | 77 | 7 | 8 |
| 2/20/57 | 70 | 1 | 4 |
| 3/20/57 | 67 | 3 | 6 |
| 4/17/57 | 65 | 0 | 5 |
| 5/17/57 | 65 | 2 | 8 |
| 6/19/57 | 54 | 3 | 6 |
| 7/12/57 | 62 | 2 | 2 |
| 8/27/57 | 57 | 1 | 1 |
| 9/20/57 | 56 | 0 | 2 |
| 10/22/57 | 55 | 0 | 1 |
| 12/4/57 | 65 | 0 | 0 |

It appears from the testimony of Dr. Baker and that of Dr. Carter, the Director of the State Federal Livestock Disease Eradication Programs in South Carolina, that Bang's disease is infectious and contagious; that it may appear in an animal anywhere from fourteen days to seven or eight months after exposure; that all cows for addition to an accredited herd should, before entering that herd, test negative when or before they come on the premises and again thirty to sixty days thereafter; and that, once infected, a herd cannot be recertified until it has shown negative on at least two tests at sixty-day intervals and preferably a third six months after the second negative test.

On July 12, 1956, Dr. Caughman, defendant's veterinarian, drew blood from the thirty-one cows that had been selected by the defendant and the plaintiff's herdsman as before mentioned; and these blood samples Dr. Caughman carried on the same day to the State Veterinary Laboratory near Columbia, together with the test record form, in several counterparts, on which he had listed these cows by their respective ear tag numbers. The blood test was made on

July 13, 1956, and later that day Dr. Caughman received by telephone the report of its result, which showed that one of the thirty-one cows was a reactor and that five were suspects. Dr. Caughman testified that upon receipt of this information he telephoned it to the defendant, giving him the ear tag number of the reactor and the ear tag number of each of the suspects. The defendant testified that Dr. Caughman telephoned him on the morning of July 14 and told him that one of the cows was a reactor, and identified it by ear tag number; but he recalled no reference having been made to the suspects, and stated that so far as he knew all of the other thirty cows were clear on the test. The written report of the test was received by Dr. Caughman on July 14; the defendant testified that he had never seen it until it was shown to him by plaintiff's counsel in the course of his cross-examination. At all events, the defendant's testimony shows that on July 14, following his telephone conversation with Dr. Caughman, he shipped by truck and had delivered to the plaintiff twenty cows, none of which appeared on the report of the July 13 test as reactor or suspect.

Dr. Caughman testified that on July 16, 1956, pursuant to the defendant's request for a report on the cows that had cleared the test of July 13, he prepared on the usual form a health certificate as to those twenty-five cows, showing on the certificate that they were owned by C. B. Jordan and consigned to S. M. Gary at Whitmire, S. C. and had tested negative for Bang's disease on July 13, and listing them by ear tag numbers. The twenty-five tag numbers listed on the health certificate of July 16 are the same as those on the report of the test of July 13 for the twenty-five cows other than the reactor and the five suspects. Actually, as has already been stated, the plaintiff's purchase was of twenty cows, and only twenty were delivered to him.

Plaintiff and his herdsman, Pelkie, testified that when the twenty cows were received from the defendant on July 14 they were put into a lot alongside of the dairy barn, as some were to freshen shortly and could be taken care of better in

a separate lot; and that they and the rest of plaintiff's herd were milked in the same barn, but at different times.

The Sutherland test of August 31 included, in addition to the twenty cows purchased from the defendant, one of the cows that the plaintiff had bought from Powers. The Powers cow was included because it had gotten into the enclosure where the Jordan cows were kept; it tested negative. Of the twenty Jordan cows, two had lost their ear tags, and consequently appear on the report of the test by their Gary neckchain numbers, 21 and 10; two had ear tags the numbers of which do not appear either on the report of the Caughman test (31 cows) of July 13, or on the Caughman health certificate (25 cows) of July 16. Of the six reactors in the report of the August 31 test, five are identifiable, by ear tag numbers, as having been listed in the Caughman test of July 13 and in the Caughman health certificate of July 16. The sixth reactor is listed in the report of the August 31 test by the chain number 10.

The cow listed in the Caughman test of July 13 by the tag number 3253067 was marked as a suspect in the report of that test. It was not among the twenty-five cows certified in the Caughman health certificate of July 16; it does not appear in the Sutherland test of August 31; and it is thus evident that it was not among the twenty cows that the defendant sold to the plaintiff on July 14. It is also evident that this cow was among the six replacements delivered by the defendant to the plaintiff between September 7 and October 5, 1956, because it is identifiable by ear tag number on the tests of November 14, 1956, December 17, 1956, January 17, 1957, February 20, 1957, March 20, 1957, April 17, 1957, and May 17, 1957,—on each of which it is marked as a suspect.

As before mentioned, on the Sutherland test of September 28, 1956 (result reported October 1), all of the Gary herd, including the fourteen Jordan cows remaining after the slaughter of the six reactors that showed up on the August

31 test, and presumably also including the three replacements that had been received prior to September 28, tested negative. The testimony indicates that, following that negative test, the Jordan cows were commingled with the rest of Gary's herd; and, presumably, the other three replacements that were received by Gary on October 5 were also put into his herd.

· Dr. Sutherland testified that since the Caughman test (July 13) of the thirty-one cows selected from the Jordan herd disclosed that one of them was a reactor, the remaining thirty should have been labeled as having been exposed to Bang's disease.

· Of the twenty Jordan cows delivered to Gary on July 14, five appeared as either a reactor or a suspect on one or more of the monthly tests from November, 1956, through July, 1957. The results of those and later tests we summarize as follows:

| Date | No. of Cows | Reactors Jordan | Other | Suspects Jordan | Other |
|---|---|---|---|---|---|
| 11/14/56 | 80 | | 4 | 2 | 3 |
| 12/17/56 | 76 | | | 2 | 5 |
| 1/17/57 | 77 | | 7 | 3 | 5 |
| 2/20/57 | 70 | | 1 | 1 | 3 |
| 3/20/57 | 67 | | 3 | 2 | 4 |
| 4/17/57 | 65 | | | 1 | 4 |
| 5/17/57 | 65 | 1 | 1 | 1 | 7 |
| 6/19/57 | 54 | 1 | 2 | 1 | 5 |
| 7/12/57 | 62 | 1 | 1 | | 2 |
| 8/27/57 | 57 | | 1 | | 1 |
| 9/20/57 | 56 | | | | 2 |
| 10/22/57 | 55 | | | | 1 |
| 12/4/57 | 65 | | | | |

· Plaintiff's case, being founded upon alleged fraud and deceit, required proof: that the defendant had made a false, material representation; that he made it with knowledge of its falsity, or recklessly, without any knowledge

of its truth, and as a positive assertion; that he intended it to be acted upon by the plaintiff; and that the plaintiff did act in reliance upon it and was thereby damaged. *Halsey v. Minnesota-South Carolina Land & Timber Co.,* 174 S. C. 97, 177 S. E. 29, 100 A. L. R. 1; *Gomillion v. Forsythe,* 218 S. C. 211, 62 S. E. (2d) 297, 53 A. L. R. (2d) 169. Appellant points to *Flowers v. Price,* 190 S. C. 392, 3 S. E. (2d) 38; *Mishoe v. General Motors Acceptance Corporation,* 234 S. C. 182, 107 S. E. (2d) 43, and *Jones v. Cooper,* 234 S. C. 477, 109 S. E. (2d) 5, as suggesting that the plaintiff in such a case must prove that the defendant had actual knowledge of the falsity of his representation, and that it is not enough to show that he made it recklessly, without any knowledge of its truth. In the three cases last mentioned, the elements of actionable fraud were declared to be: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) his intent that it should be acted upon by the hearer; (6) the hearer's ignorance of its falsity; (7) his reliance upon its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury. But that enumeration is not, in our opinion, inconsistent with the idea, expressed in the *Halsey* and *Gomillion cases,* that to make a false representation recklessly, without knowledge as to its truth, is tantamount, in contemplation of law, to making it with knowledge of its falsity. Of course, fraud is never presumed, *Smith v. Traxler,* 224 S. C. 290, 78 S. E. (2d) 630, and its proof requires evidence that is clear, cogent and convincing, *Singleton v. Mullins Lumber Co.,* 234 S. C. 330, 108 S. E. (2d) 414. But it may, and ordinarily can only, be established by circumstantial evidence. *Cook v. Metropolitan Life Ins. Co.,* 186 S. C. 77, 194 S. E. 636; *Blackmon v. United Insurance Co.,* S. C., 111 S. E. (2d) 552. Thus knowledge of the falsity of a representation is legally inferable where one makes it as of his personal knowledge, realizing that he is without information as to its truth, and recklessly disre-

garding that lack of information. 24 Am. Jur., Fraud and Deceit, Section 263.

Appellant contends, too, that since the twenty cows sold to Gary on July 14 had shown negative on the Caughman test of July 13, he had acted within his legal rights in selling them, and that therefore fraud in the transaction cannot be implied or inferred. *Mishoe v. General Motors Acceptance Corporation, supra.* But we think that in the circumstances of this case the issue of fraud may not be disposed of so easily. In the first place, there was testimony to the effect that appellant knew that Gary's herd was an accredited one; that he knew that thirty of the thirty-one cows in the Caughman test had been exposed to Bang's disease, and that five of them were suspects; that as an experienced dealer in cattle he was chargeable with knowledge that Bang's disease takes at least fourteen days to develop after exposure to it; and that at least two of the cows delivered to Gary on July 14 had not been among those tested. There is also testimony, uncontradicted, that one of the replacement cows delivered to Gary after the Sutherland test of August 31 had been exposed to Bang's disease at the time of the Caughman test on July 13 and had been marked as a suspect on the report of that test.

In our opinion the evidence was sufficient to take the issue of fraud and deceit to the jury.

Appellant invokes the well-known rule (*Mobley v. Quattlebaum,* 101 S. C. 221, 85 S. E. 585; *Whitman v. Seaboard Air Line Ry.,* 107 S. C. 200, 92 S. E. 861, L. R. A. 1917F, 717; *Scott v. Newell,* 146 S. C. 385, 144 S. E. 82; *Flowers v. Price, supra; Thomas v. American Workmen,* 197 S. C. 178, 14 S. E. (2d) 886, 136 A. L. R. 1; *Jones v. Cooper, supra*) that one will not be heard to say that he was deceived by a vendor's misrepresentations if, by his own negligent failure to avail himself of information easily within his reach that would have disclosed the truth, he has contributed to the perpetration of the alleged fraud. But the facts here can hardly be said to call for the application

of that rule, and certainly do not require the conclusion that respondent's claim is barred, as a matter of law, by such contributory negligence on his part. The record suggests no reason for him to have doubted, when the twenty cows were delivered to him on July 14, that they were "clean"; the health certificate that Dr. Caughman signed on July 16 and mailed to him made no mention of their having been exposed to Bang's disease, but certified them as having been tested and found "free from symptoms of contagious, infectious or communicable disease." As to Gary's conduct in mingling the Jordan cows with his heard, the evidence shows, as we have stated, that upon their receipt on July 14 these cows were put into a separate lot near the dairy barn and that they and the rest of the Gary herd were milked in the same barn, but at different times. Conceivably the disease may have been thereby transmitted to Gary's other cows prior to the August 31 test; but there is nothing in the record to indicate that Gary had any reason to know, until he received the report of that test, that the Jordan cows had been exposed to the disease. If thereafter he was negligent in permitting the Jordan cows (other than the reactors, that were slaughtered, and the suspects, that were segregated) to mingle with his other cows, such negligence, while pertinent to his duty to minimize his loss, and consequently to the amount of his recovery, cannot fairly be said to have contributed to the perpetration of the fraud, for the simple reason that the fraud, if there was any, had already been perpetrated.

Paragraph 11 of the complaint, as originally drawn, alleged that some of the cows purchased from the defendant had been tested at the State Laboratory on July 12, 1956, "at the request of defendant and that the results of such test showed the presence of Bang's disease in the cows sold to plaintiff." At the close of his case the plaintiff was permitted, over defendant's objection, to amend this paragraph to conform to the proof, by changing the last three words from "sold to plaintiff" to "tested by defendant". We are clearly of the opinion, as was the trial judge, that this

amendment effected no substantial change in the plaintiff's claim, and that it was therefore allowable under Section 10-692 (d) of the 1952 Code.

By several exceptions, appellant contends that the trial judge should have excluded evidence that Bang's disease appeared in respondent's herd after the August 31 and September 28 tests because: (1) such evidence was not related to or connected with the acts of the appellant; and (2) the appearance of the disease after the August 31 test, and especially after the September 28 test (in which the whole herd tested negative) resulted from respondent's mingling of the exposed cows with the rest of his herd. We are unable to agree with this contention. In the light of the testimony that anywhere from fourteen days to seven or eight months may elapse between exposure and appearance of the disease, we do not think that it can be said as a matter of law that its occurrence after these tests was unrelated to the transaction in question. In the second aspect of this contention appellant suggests that the evidence under discussion should not have been received because the appearance of the disease after the August 31 and September 28 tests was due to respondent's negligence in mingling the exposed cows with the rest of his herd. But this suggestion is disposed of by what has already been said in our discussion of the claim of contributory negligence.

The trial judge permitted cross-examination of the defendant, over his counsel's objection, concerning a proceeding instituted against him in January, 1957, by the State Veterinarian, seeking to enjoin him from removing any cattle from his premises, for the reason that certain cattle that had been removed therefrom since the quarantine of his herd (September 14, 1956) had shown signs of Bang's disease. On re-direct examination the defendant was questioned and testified on the same subject, without reservation. His right to challenge the ruling was thereby waived. *McLane v. Reliance Life Ins. Co. of Pitts-*

*burgh,* 192 S. C. 245, 6 S. E. (2d) 13; *Richardson v. Register,* 227 S. C. 81, 87 S. E. (2d) 40.

Finally, appellant contends that the trial judge erred in refusing to charge that in an action for fraud the plaintiff must show not only that the defendant made a false representation, but also that he had actual knowledge of its falsity when he made it. Appellant's position here is unsound, for, as we have before stated and as the trial judge correctly charged, fraud may also be inferred where a false material representation has been made recklessly, without any knowledge of its truth, and as a positive assertion. *Halsey v. Minnesota-South Carolina Land & Timber Co., supra; Gomillion v. Forsythe, supra.*

Affirmed.

STUKES, C. J., and TAYLOR, OXNER and MOSS, JJ., concur.